1
2
3
4
5
6
7               IN THE UNITED STATES DISTRICT COURT
8            FOR THE NORTHERN DISTRICT OF CALIFORNIA
9    DIAN C. LYMBURNER,
10              Plaintiff,                      No. C-08-00325  EDL
11         v.                                   **ORDER GRANTING FINAL APPROVAL
                                                OF CLASS ACTION SETTLEMENT AND
12    U.S. FINANCIAL FUNDING, INC.,             GRANTING PLAINTIFF'S MOTION
                                                FOR ATTORNEYS' FEES**
13              Defendant.
14   _____/

**United States District Court**
**For the Northern District of California**

15       Plaintiff Dian C. Lymburner brought this putative class action lawsuit against Defendant U.S.

16   Financial Funding alleging claims for fraudulent omissions, breach of contract, and breach of the

17   implied covenant of good faith and fair dealing.  On September 22, 2009, Plaintiff filed a motion to

18   certify the class, and on January 22, 2010, the Court granted that motion.  In 2010, the parties

19   engaged in extensive negotiation and reached a settlement.  On August 24, 2011, the Court

20   preliminarily approved the settlement and ordered that Class Notices be sent by the Settlement

21   Administrator, Gilardi and Co., LLC., to the potential Class Members.

22       Now before the Court is the parties' Joint Motion for Final Approval of Class Action

23   Settlement and Plaintiff's Motion for Attorneys' Fees.  The Court held a hearing on these motions

24   on January 31, 2012. For the reasons stated at the hearing and in this Order, the Court grants the

25   Joint Motion for Final Approval and Plaintiff's Motion for Attorneys' Fees.

26   **The Settlement Class**

27       The class consists of all individuals in the United States who, between January 17, 2004 and

28   September 21, 2011, obtained an Option ARM loan originated by U.S. Financial Funding, Inc., with

     the following characteristics: (I) the numerical interest rate listed on page one of the Promissory

Note is 3.0% or less; (II) in the same paragraph referenced in (I), the Promissory Note uses the term "may" instead of "will" or "shall" change, when describing an increase in that listed numerical rate. E.g.: The interest rate I will pay **may** change; (III) the margin amount added to the index for the loan is equal to or greater than 1.75%; (IV) the Promissory Note does not contain any statement that paying the amount listed as the "initial monthly payment" "will" as opposed to "may" result in negative amortization after the first interest rate change date.  Excluded from the Class are Defendant's employees, officers, directors, agents, representatives, and their family members, as well as the Court and its officers, employees, and relatives.

**The Settlement Amount**

The Settlement provides that Defendant will pay the remaining amount of the eroding insurance policy, which was recently estimated to be approximately $145,000.00.  See Berns Decl. ¶ 6.  The Class Representative Payment of $5,000.00, the attorney's fees and expenses of $36,250.00, and the payment to the Settlement Administrator of $10,000.00 will be deducted from the Settlement Amount.  The Net Settlement Amount is approximately $93,750.00.

The Net Settlement Amount will be distributed to claimants in equal portions. See Settlement (Docket # 136).  Amounts from any undeliverable and uncashed checks will become part of a *cy pres* fund for The National Consumer Law Center.  See id.

**Discussion**

Final approval of a class action case settlement requires two inquiries.  First, the district court must assess whether a class exists.  See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997).  Second, the district court must consider whether a proposed settlement is "fair, reasonable, and adequate."  See Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998) (recognizing that "[i]t is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness. . . .").  Because a class has already been certified, the only issue for the Court to consider is whether the settlement is fair, reasonable, and adequate.

**1.    Notice**

Rule 23(e) requires that adequate notice be provided to all class members.  Here, the court-approved notice was provided through Gilardi and Co., LLC. ("Gilardi"), a company with expertise

1    in class action settlement notification.  See Berns Decl. ¶ 10.  On August 22, 2011, Defendant's

2    counsel provided Gilardi with a spreadsheet containing the names and addresses of borrowers who

3    were potential class members.  See Morrison Decl. ¶ 2.  On September 21, 2011, Gilardi mailed the

4    Notice Packet via United States Postal Service mail to the 141 class members.  See id. ¶ 5.

5          Before the Notice Packets were mailed, the class members' addresses were formatted for

6    duplicates and updated through the National Change of Address Database maintained by the United

7    States Postal Service.  See id. ¶ 2.  Gilardi established a toll free telephone number for the purpose of

8    providing information to class members.  See id. ¶ 3.  Gilardi also produced a static case website that

9    contained links to court filings, the Notice Packet, contact information, and frequently asked

10   questions.  See id. ¶ 4.

11         Gilardi received two Notice Packets returned with updated addresses and immediately

12   remailed the Packets to the updated addresses.  See id. ¶ 6.  Since mailing the Notice Packets, twenty

13   Notice Packets were returned with undeliverable addresses.  See id. ¶ 7.  Through a third party

14   service, Gilardi found updated addresses for eighteen of the twenty and remailed the Notice Packets.

15   See id.  Gilardi did not receive any objections from class members or any opt-out requests.

16   **2.    Fairness of Settlement**

17         "Fed. R. Civ. P. 23(e) requires the district court to determine whether a proposed settlement is

18   fundamentally fair, adequate, and reasonable."  Hanlon, 150 F.3d at 1026.  To determine whether a

19   settlement agreement meets this standard, a district court must consider a number of factors,

20   including:

21         the strength of the plaintiff's case; the risk, expense, complexity, and likely duration
           of further litigation; the risk of maintaining class action status throughout the trial; the
22         amount offered in settlement; the extent of discovery completed and the stage of the
           proceedings; the experience and views of counsel; the presence of a governmental
23         participant; and the reaction of the class members to the proposed settlement.

24   Hanlon, 150 F.3d at 1026; see also Staton v. Boeing, 327 F.3d 938, 959 (9th Cir. 2003).  District

25   court review of class action settlements "includes not only consideration of whether there was *actual*

26   fraud, overreaching or collusion but, as well, substantive consideration of whether the terms of the

27   decree are 'fair, reasonable and adequate to all concerned.'"  Staton, 327 F.3d at 960 (quoting

28

                                                        3

United States District Court
For the Northern District of California

Officers for Justice v. CCSF, 668 F.2d 615, 625 (9th Cir. 1982)).  The appellate court will rarely

overturn approval of a class action settlement unless "the terms of the agreement contain convincing

indications that the incentives favoring pursuit of self-interest rather than the class's interests in fact

influenced the outcome of the negotiations and that the district court was wrong in concluding

otherwise." Staton, 327 F.3d at 960.  In Staton, the court focused on whether the aspects of the

settlement that lend themselves to pursuit of self-interest, namely attorney's fees and distribution of

monetary relief among class members, "strictly comported with substantive and procedural

standards designed to protect the interests of class members."  Staton, 327 F.3d at 960.

Here, the parties argue that they reached a non-collusive settlement after sufficient discovery

that enabled counsel to make educated decisions about the strengths and weaknesses of the case.

See, e.g. Linney v. Cellular Alaska P'ship, 1997 WL 450064, at *5 (N.D. Cal. Jul. 18, 1997) ("The

involvement of experienced class action counsel and the fact that the settlement agreement was

reached in arm's length negotiations, after relevant discovery had taken place create a presumption

that the agreement is fair.").  Moreover, the Hanlon factors weigh in favor of finding that the

settlement is fair.  First, Plaintiffs may have a meritorious case, but the risks inherent in continued

litigation are great.  Defendant continues to deny liability for any harm suffered by Plaintiffs and the

disputed factual and legal issues would be complex and costly to resolve at trial.

Second and importantly, the Settlement Agreement is premised on Defendant's limited asset.

Defendant has no other source of funding other than an eroding insurance policy, which was valued

at $174,000, and which is now valued at $145,000, which is the total settlement amount.  Since there

is no other source to fund settlement or damages, the proposed Settlement Agreement poses little

risk of creating prejudice against individual class members.

Third, the plan for distributing the settlement is fair and a further showing was made at the

January 31, 2012 hearing.  The Settlement Agreement provides for an award of attorneys' fees to

Plaintiff's counsel up to twenty-five percent of the settlement amount.  Twenty-five percent is

considered a benchmark for attorney's fees in common fund cases.  See Hanlon, 150 F.3d at 1029.

But the Ninth Circuit has also stated that "the 25 percent benchmark rate, although a starting point

1   for analysis, may be inappropriate in some cases.  Selection of the benchmark or any other rate must

2   be supported by findings that take into account all the circumstances of the case."  Vizcaino v.

3   Microsoft Corp., 290 F.3d 1043, 1047 (9th Cir. 2002).  See also Alberto v. GMRI, Inc., 2008 WL

4   2561106, 11-13 (E.D. Cal. June 24, 2008) (holding that a 22 percent fee request on a common fund

5   was unjustified because the case was less than one year old, no hearings had been held, the only

6   motions filed were mooted by the parties' stipulated stay of action, and formal discovery never got

7   underway; the Court looked to the lodestar method instead and required counsel to file a declaration

8   thoroughly explaining the fees prior to the fairness hearing).  As described in more detail below,

9   Plaintiff's request for fees in the amount of 25% of the settlement amount is reasonable.

10         Further, the Settlement Agreement's incentive payment of $5,000 to the named Plaintiff is

11   reasonable.  While courts have found that $5,000 incentive payments are reasonable, the Court must

12   evaluate the award individually to detect excessive payments.  Staton, 327 F.3d at 952; In re Mego

13   Fin. Corp. Sec. Litig., 213 F.3d 454, 463 (9th Cir. 2000) (approving incentive award of $5,000 to

14   two plaintiff representatives of 5,400 potential class members in $1.75 million settlement, where

15   incentive payment constituted only 0.56% of the settlement); Alberto v. GMRI, Inc., 2008 WL

16   2561106, 11-13 (E.D. Cal. June 24, 2008) (requiring the parties to present evidence showing the

17   named plaintiff's substantial efforts taken as class representative to justify the discrepancy between

18   her $5,000 award, constituting 0.71% of the settlement, and the $24.17 that each class member was

19   expected to receive).  To assess whether an incentive payment is excessive, district courts balance

20   "the number of named plaintiffs receiving incentive payments, the proportion of the payments

21   relative to the settlement amount, and the size of each payment."  Staton, F.3d at 977.  Here, the

22   incentive payment is approximately 3.4% of the settlement.  However, there is only one named

23   plaintiff, and she has explained in detail the activities and work that she has done in connection with

24   the case, including participating in phone conversations with counsel, compiling documents for and

25   responding to discovery requests, preparing for, traveling to and sitting for her deposition, traveling

26   to and attending two mediation sessions, and corresponding monthly via email and telephone with

27   counsel over a three year period.  See Lymburner Decl. ¶¶ 2-3.

28

With respect to the other settlement terms, the parties have agreed that the amount of any undeliverable and uncashed checks will become part of a *cy pres* fund for The National Consumer Law Center.  The law generally favors distributing unclaimed funds for a purpose as near as possible to the legitimate objectives underlying the lawsuit.  See e.g., In re Airline Ticket Commission Antitrust Litigation, 307 F.3d 679, 680 (8th Cir. 2002) (holding that the trial court had abused its discretion with respect to *cy pres* distribution because there was no nexus between the injured class and the local organizations receiving unclaimed funds) (citing Powell v. Georgia-Pacific Corporation, 119 F.3d 703, 706-07 (8th Cir. 1997) (approving the district court's order that nearly $1 million in remainder settlement funds be distributed as scholarships to African American high school students because the scholarship program carried out the plaintiffs' desire and addressed the subject matter of the lawsuit: employment opportunities available to African Americans in the region)).  Here, the selection of the *cy pres* fund recipient is reasonable because The National Consumer Law Center has a nexus with the legitimate objectives of this lawsuit.  The National Consumer Law Center ("NCLC") is a nonprofit advocacy organization that promotes economic security and family wealth for economically disadvantaged Americans.  Although the nexus between The National Consumer Law Center and the injured class is somewhat attenuated given Defendant's place of business is California and the NCLC has no office in California, the organization generally protects consumers from unfair and exploitive transactions nationwide.  The Court concludes that the proposal for what is likely to be only modest *cy pres* distribution, if any, is reasonable.

The parties contend that the response of the class members to the proposed settlement has been positive and that no class member has filed an objection or exclusion request.  See Berns Decl. ¶ 9.  Although it appears that two class members may not have received Notice Packets, the reaction of the class members who received notice indicates strong support final approval of the settlement.  Further, the parties stated at the January 31, 2012 hearing that there have been no objections nor opt-outs since the motion for final approval was filed.  Accordingly, the Settlement Agreement is fair, reasonable, and adequate, and the Court grants the Joint Motion for Final Approval of Class Action Settlement.

**3. Plaintiff's Motion for Attorneys' Fees**

Counsel seeks $36,250.00 in fees and expenses, which is 25% of the estimated value of the settlement.  There is a 25% benchmark for attorneys' fees in common fund cases.  Hanlon, 150 F.3d at 1029.  "The 25% benchmark rate, although a starting point for analysis, may be inappropriate in some cases.  Selection of the benchmark or any other rate must be supported by findings that take into account all the circumstances of the case."  Vizcaino, 290 F.3d at 1047.

There are two separate methods for determining attorneys' fees, depending on the case: (1) common fund doctrine and (2) lodestar calculation.  As stated in Hanlon:

> In "common-fund" cases where the settlement or award creates a large fund for distribution to the class, the district court has discretion to use either a percentage or lodestar method. [In re Washington Public Power Supple Systems sec. Litig., 19 F.3d 1291, 1295 (9th Cir. 1994).]  The percentage method means that the court simply awards the attorneys a percentage of the fund sufficient to provide class counsel with a reasonable fee.  Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268, 272 (9th Cir. 1989).  This circuit has established 25% of the common fund as a benchmark award for attorney fees.  Six (6) Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. 1990). . . .
>
> The lodestar calculation begins with the multiplication of the number of hours reasonably expended by a reasonable hourly rate.  Blum v. Stenson, 465 U.S. 886, 897 (1984).  The hours expended and the rate should be supported by adequate documentation and other evidence; thus attorneys working on cases where a lodestar may be employed should keep records and time sheets documenting their work and time spent.  The resulting figure may be adjusted upward or downward to account for several factors including the quality of the representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment.  Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 70 (9th Cir. 1975).

Hanlon, 150 F.3d at 1029.  The common fund doctrine applies only if "'(1) the class of beneficiaries is sufficiently identifiable, (2) the benefits can be accurately traced, and (3) the fee can be shifted with some exactitude to those benefitting.'"  Paul, Johnson, 886 F.2d at 271 (quoting In re Hill, 775 F.2d 1037, 1040 (9th Cir. 1985)).  These criteria are met where "each member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-sum [settlement] recovered on his behalf.'"  Paul, Johnson, 886 F.2d at 271 (quoting Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980); see also Blum v. Stenson, 465 U.S. 886, 900, n. 16 (1984) (noting that percentage-of-the-fund is an appropriate method to award attorney's fees in common fund cases); Florida v. Dunne, 915 F.2d 542, 545 (9th Cir. 1990) ("Despite the recent ground swell of support for

**United States District Court**
For the Northern District of California

1   mandating a percentage-of-the-fund approach in common fund cases, however, we require only that

2   fee awards in common fund cases be reasonable under the circumstances.  Accordingly, either the

3   lodestar or the percentage-of-the-fund approach may, depending upon the circumstances, have its

4   place in determining what would be reasonable compensation for creating a common fund.")

5   (internal citation omitted).  The appropriate measure of the fee amount is against the potential

6   amount available to the class (here, $145,000.00), not a lesser amount reflecting the amount actually

7   claimed by the members.  See Van Gemert, 444 U.S. at 477-82.  Here, the three Paul, Johnson

8   factors are met: the class is identified, the benefits can be accurately traced because they are

9   monetary payments directly to class members, and the fee can be shifted with exactitude because

10  counsel is claiming a specific percentage of the fund.

11         The 25% benchmark for fee awards may be adjusted by the district court, but an adjustment is

12  warranted for "unusual circumstances."  Paul, Johnson, 886 F.2d at 272.  Class counsel here does

13  not seek more than the 25% benchmark and states that the fees sought are lower than the actual fees

14  incurred.  See Berns Decl. ¶ 25.  Litigation has been ongoing for almost four years, and the parties

15  engaged in informal discovery and mediation.  The four firms for class counsel have expended well

16  over 500 hours prosecuting this action.  See Mot. for Fees at 2; Berns Decl. ¶ 24; Fields Decl. ¶ 4;

17  Anderson Decl. ¶ 4; and Kellner Decl. ¶ 3.  Counsel also notes that neither class certification nor

18  victory in this case was certain, so the risk in taking this case justifies the fees.  See Berns Decl. ¶

19  16.  An additional risk in taking on this case for class counsel is the fact that Defendant no longer

20  exists, and recovery is limited to funds in an eroding insurance policy. Litigation would have

21  required substantial time and resources with no potential for a higher award.  Therefore, Plaintiff's

22  motion for attorneys' fees is granted.

23         Here, Plaintiff's attorneys will receive less than their lodestar, in effect incurring a negative

24  multiplier.  See Berns Decl. ¶ 25.  In Vizcaino, the Ninth Circuit noted that most multipliers range

25  between 1.0 and 4.0.  290 F.3d at 1053-54.  By contrast, the negative multiplier in this case supports

26  the reasonableness of the fee request.

27

28

**Conclusion**

The Joint Motion for Final Approval of the Class Action Settlement is granted.  In addition, Plaintiff's Motion for Attorneys' Fees is granted in the amount of $36,250.00.

The named Plaintiff, the Class and each Class Member are hereby permanently enjoined and barred from instituting, commencing, or prosecuting any released claim against a released entity in any action or proceeding in any court or tribunal.  Without affecting the finality of this Order and the Judgment hereby entered, the Court retains exclusive jurisdiction including the administration, interpretation, effectuation, or enforcement of the Settlement.  The action is hereby ordered dismissed with prejudice, each side to bear its own costs and attorneys' fees except as provided by Settlement.

**IT IS SO ORDERED.**

Dated: February 7, 2012

ELIZABETH D. LAPORTE
United States Magistrate Judge

United States District Court
For the Northern District of California

9